[Cite as *State v. White*, 2019-Ohio-4562.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
VINTON COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| | : | Case No. 19CA715 |
| Plaintiff-Appellee, | : | |
| | : | |
| vs. | : | DECISION AND JUDGMENT |
| | : | ENTRY |
| KEITH A. WHITE, | : | |
| | : | |
| Defendant-Appellant. | : | **Released: 11/01/19** |

_____
APPEARANCES:

Timothy P. Gleeson, Logan, Ohio, for Appellant.

Trecia Kimes-Brown, Vinton County Prosecutor, and William L. Archer, Jr., Assistant Vinton County Prosecutor, McArthur, Ohio, for Appellee.

_____

McFarland, J.

{¶1} This is an appeal from a Vinton County Court of Common Pleas judgment entry convicting Appellant, Keith White, of felonious assault, disrupting public services, and domestic violence.

{¶2} On appeal, Appellant asserts (1) "[he] was denied his right to due process and his right to compulsory attendance of a witness when the trial court ruled he could not call the assistant prosecuting attorney as a witness," and (2) "[he] was denied his right to due process when his trial attorney

provided ineffective assistance of counsel by failing to move the trial court

for White to appear before the jury in clothing other than a jail uniform."

{¶3} Based upon our review of the law and the record, we overrule

Appellant's assignments of error and affirm the judgment of the trial court.

PROCEDURAL HISTORY

{¶4} The State charged Appellant with attempted murder, felonious

assault, domestic violence, disrupting public service, and aggravated

menacing. Appellant pleaded not guilty to all charges. The case proceeded

to trial on all charges, except aggravated menacing.

{¶5} Prior to Appellant's trial, the court addressed Appellant's

subpoena to compel the assistant prosecutor in this case to appear and bring

all notes and mental recollections from his conversation with Crystal Arthur

("Ms. Arthur"), the victim in this case, regarding her purported claim that

Appellant took video/pictures of his attack.

{¶6} Appellant argued that the assistant prosecutor's testimony would

provide "Brady material. It's constitutional." Appellant's counsel asserted

that the assistant prosecutor informed him that Ms. Arthur alleged Appellant

had recorded the assault of her with his cell phone. However, Appellant

claimed that the State had never produced video of the attack during

discovery. Therefore, Appellant argued, the only way to determine the

content of that recording was through the testimony of the assistant

prosecutor.

{¶7} In response, the State admitted that it had disclosed to

Appellant's counsel that Ms. Arthur claimed there was a cell phone video of

Appellant's assault of Ms. Arthur. The State further asserted that they

recovered the phone and shipped it off for review, but "[n]othing

materialized." And, the State argued that it was nearly certain that it

informed defense counsel that the phone contained no video of the attack.

Finally, the prosecutor also argued that he had disclosed this information to

Appellant's counsel in April, more than six months before the trial in

November, and yet Appellant did not raise this issue until trial.

{¶8} Appellant's counsel admitted that the prosecutor had informed

him that no recording existed, but he argued that "the only proof of that [no

video of the attack exists] is [the assistant prosecutor's testimony]."

{¶9} The trial court pointed out that the prosecutor had already

informed Appellant that there was nothing on the phone so the court didn't

think that there was a genuine dispute to which the prosecutor could testify.

And, after confirming with the prosecution that Ms. Arthur was going to

testify, the court also pointed out that Appellant could cross-examine the

victim regarding the alleged videotaping.

{¶10} The trial court found that because the State had previously disclosed to Appellant, albeit informally, that there was no recording on the phone, there was no *Brady* violation because there was nothing that had been withheld by the State. The court again noted that Appellant would have an opportunity to cross-examine the victim regarding any alleged videotaping of the alleged attack. The court stated: "And so then the question comes back to whether, whether based on all of this taken together is a sufficient reason, uh basically, to disqualify the prosecutor from presenting the case from going forward with a trial." The court found "there is not[,]" and denied Appellant's request to call the prosecutor as a witness for the defense.

{¶11} Prior to trial, the State also raised a concern that Appellant was dressed in prison clothes. Prior to voir dire and out of the jury's presence, the prosecutor brought to the attention of the court that the State had concerns that the defendant was in prison clothes instead of street clothes for his trial. However, Appellant's counsel stated: "I have nothing to add to that judge. I am not familiar with the case law to which [the prosecutor] is referring." The judge then stated: "All right. Very well then. Anything further?" Both attorneys responded in the negative, and proceedings continued.

{¶12} The State's first witness at trial was Dr. Thanh Guyen, a trauma surgeon at Grant Hospital in Columbus. He testified that on February 13, 2018, he treated Ms. Arthur for a skull fracture and bleeding in the brain, which were caused by trauma to the head.

{¶13} The State's next witness, Ms. Arthur, testified that she moved in with Appellant in June of 2017. Ms. Arthur described Appellant as her best friend. She testified that "[life] was good." However, she testified that in the winter of 2018 finances became an issue in their relationship. Ms. Arthur testified that during an argument over finances, Appellant hit her in the mouth and then in her face, causing her to bleed. She testified that Appellant laughed and that at some point she passed out. Ms. Arthur testified that Appellant poured water on her face and then started kicking her in the side, telling her to wake up. She testified that he said he was going to kill her, grabbed her by the hair several times and even put her in the bathtub, turned on the water, and held her head under water. She testified that she tried to fight back, but was not strong enough. She testified that Appellant had taken her phone and keys and that he even tried to strangle her with an extension cord. Ms. Arthur testified that she finally got away from him and called 911 on an old phone.

{¶14} Ms. Arthur testified that once the officers arrived they arrested Appellant.  She testified that an ambulance arrived and the emergency medical technicians told her that she needed to go to the hospital.  She testified that she didn't want to leave her car behind so she called her mother and arranged for them to meet at the gas station.  Ms. Arthur testified that she pulled into the gas station, but the next thing she remembered was waking up in the hospital.  She testified that she did not recall being "life-flighted" to Grant hospital in Columbus.  She testified that she continues to suffer "consistent" headaches, memory loss, problems with her vision, and pain in her foot.  Ms. Arthur then identified Appellant her assailant.

{¶15} On cross examination, Ms. Arthur admitted that her testimony was inconsistent with what she stated in her statement.  She admitted that there was no discussion in the statement that Appellant had attempted to drown her in the bath tub.  She also admitted that there was nothing in the report about Appellant hitting her with a hammer, but she mentioned a hammer attack in a second report.  Finally, Appellant's counsel asked Ms. Arthur: "Okay.  And do you, you indicated you recall alleging that [Appellant] held you down, beat you and videoed the incident while it was going on?"  Ms. Arthur responded: "He said he was.  I wasn't on the other

side of the phone.  All I know is he had it in front of me while he was hitting

me."

{¶16} The State's third witness was Vinton County Deputy Sheriff

Mark Cosgray.  He testified that he responded to a domestic violence call at

43753 Covered Bridge Road.  He testified that when he arrived he saw

Deputy Nick Trainer talking to Ms. Arthur in the yard.  Deputy Cosgray

testified that he entered the house and both deputies arrested Appellant for

an existing warrant, and Deputy Trainer read Appellant his rights.  Deputy

Cosgray testified that while he was transporting Appellant to the sheriff's

office, Appellant admitted that he had struck Ms. Arthur with a crutch

because she had attacked him, causing him injury.  Deputy Cosgray testified

that he took pictures of Appellant's injuries.

{¶17} Vinton County Deputy Sheriff Trainer was the State's next

witness.  He testified that he responded to Ms. Arthur's 911 call and when

he arrived Ms. Arthur was limping toward him from the porch, she appeared

to have bruises on her body, and her makeup was running down her face

from crying.  Deputy Trainer testified that Ms. Arthur told him that

Appellant had beaten her, and he was in the house.  Deputy Trainer testified

that initially he called an ambulance because Ms. Arthur "seemed pretty

bruised up and her limp and everything."  Deputy Trainer testified that he

went into the house and he found Appellant sitting on the couch. Deputy Trainer testified that when they arrested Appellant he became agitated and was "mouthing" the deputies. Deputy Trainer testified that Ms. Arthur told him that Appellant had threatened her with a hand gun, shot gun, and a sawed-off shot gun, which he located and collected. Deputy Trainer testified that Ms. Arthur showed him a broken, bent crutch that she alleged Appellant used to beat and choke her. Deputy Trainer testified that he took pictures of the crutch and Ms. Arthur's injuries (bruising and bloody lip). Deputy Trainer testified that he and Deputy Cosgray told Ms. Arthur that she needed to go to the hospital, but he said she was "adamant" about taking herself to the hospital. Deputy Trainer and the emergency medical personnel packed some of Ms. Arthur's things and then put them in her car. Deputy Trainer testified that he then let Ms. Arthur use his phone to contact a family member and she made arrangements to meet them.

{¶18} On cross examination, Deputy Trainer agreed that his report of this incident was not entirely consistent with his testimony. Specifically, Deputy Trainer testified that Ms. Arthur barely spoke to him the day of the incident, but his report indicates that she was "screaming and crying." When asked if he recalled Ms. Arthur having any memory issues at the time, Deputy Trainer testified she "had a hard time recollecting what all had

occurred to me at that incident." Deputy Trainer testified, clarifying that Ms. Arthur packed her clothes into trash bags and then he and the emergency medical personnel loaded those bags into Ms. Arthur's car. Deputy Trainer testified that he did not see the cord that Ms. Arthur alleged Appellant used in an attempt to choke her. Deputy Trainer testified that Ms. Arthur told him that the attack happened at 2 p.m., but his report stated it happened at 3 p.m.

{¶19} The State's next witness was Kathryn Carter, an emergency room nurse at Grant Medical Center. Nurse Carter testified that Ms. Arthur was alert and oriented and the staff had administered "Nubian" (pain medication) and NARCAN. Nurse Carter then reviewed Ms. Arthur's medical record from that visit, which admitted her on 2-13-2018 and discharged her on 2-15-2018. She testified that it indicated that Ms. Arthur was not intoxicated. She testified she could not state why Ms. Arthur was given NARCAN, but that it can be given to reverse the effect of Nubian if a patient gets too drowsy.

{¶20} The State's next witness was Ashley Cowgill, a speech language pathologist. Ms. Cowgill evaluated Ms. Arthur during her hospital visit for the assault. During her testimony, Ms. Cowgill read from a report from Dr. Jonathan Pedrick who had evaluated Ms. Arthur. Reading from

that report, Ms. Cowgill stated "Severe traumatic brain injury with subdural hematoma" with a "gait disturbance and acute pain."

{¶21} The State's next witness was Mary Marcum, the SANE (Sexual Assault Nurse Examiner) coordinator at Grant Hospital. She testified that she is called for sexual assault victims, elder abuse victims and domestic violence victims. Nurse Marcum testified that SANE nurses question the victim about what happened and document injuries, etc. Nurse Marcum testified that SANE nurses help bridge the gap between medical and legal assistance.

{¶22} Nurse Marcum testified that she saw Ms. Arthur when she was in the hospital for the assault. Nurse Marcum documented Ms. Arthur's injuries, which included injury/trauma to her mouth, face, head, neck, chest, buttocks, back, and her extremities, as well as "brain bleeds on each side of her skull," as documented by Ms. Arthur's treating physician. Nurse Marcum testified that Ms. Arthur reported that Appellant punched her, slapped her, dragged her by the hair, strangled her, and put her under water to be drowned. Nurse Marcum noticed a lot of bruising, a ligature mark, abrasions, missing fingernails, blisters on her fingers, and a petechiae (minute blood vessel ruptures on the surface of the skin) in one of her eyes. Nurse Marcum took 106 photographs documenting Ms. Arthur's injuries.

Nurse Marcum testified that there was bruising behind Ms. Arthur's left ear, which can indicate strangulation. Nurse Marcum testified that trauma can render people unable to give the exact time and date of events that have occurred.

{¶23} On cross examination, Nurse Marcum admitted that petechiae can occur from reasons other than trauma. Nurse Marcum also admitted that there was no DNA or physical evidence collected in this case.

{¶24} The State's next witness was Rebecca Hess, Ms. Arthur's mother. Ms. Hess testified that in February 2018, she received a call from Deputy Trainer that Ms. Arthur was in bad shape and she wanted to meet Ms. Hess at a gas station. Ms. Hess testified that she met Ms. Arthur at the gas station and that her daughter's face was "all busted up" and "she could barely walk." Ms. Hess testified that she drove Ms. Arthur to the hospital at Adena. She testified that Ms. Arthur blacked out several times during the trip. She testified that the physicians at Adena Hospital had Ms. Arthur transported by "CareFlight" to Grant Hospital in Columbus. Ms. Hess testified that after Ms. Arthur was released from the hospital, she cared for Ms. Arthur.

{¶25} After testimony from Paul Mullins, the dispatcher for the Vinton County Sheriff's Office, the State rested its case. Appellant did not present any witnesses.

{¶26} The jury found Appellant guilty of all charges, except attempted murder. The trial court imposed an eight-year prison sentence for felonious assault, 18 months for disrupting public services, and 180 days for domestic violence, all to be served concurrently to each other for an aggregate eight-year prison sentence. It is from this judgment entry of conviction that Appellant appeals, asserting two assignments of error.

## ASSIGNMENTS OF ERROR

"I. WHITE WAS DENIED HIS RIGHT TO DUE PROCESS AND HIS RIGHT TO COMPULSORY ATTENDANCE OF A WITNESS WHEN THE TRIAL COURT RULED HE COULD NOT CALL THE ASSISTANT PROSECUTING ATTORNEY AS A WITNESS.

II. WHITE WAS DENIED HIS RIGHT TO DUE PROCESS WHEN HIS TRIAL ATTORNEY PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL BY FAILING TO MOVE THE TRIAL COURT FOR WHITE TO APPEAR BEFORE THE JURY IN CLOTHING OTHER THAN A JAIL UNIFORM."

## ASSIGNMENT OF ERROR I

{¶27} In Appellant's first assignment of error, he contends the trial court violated his right to compel the assistant prosecutor to appear as a witness in his case.

{¶28} Appellant argues that he has a right to call the prosecutor as a witness under Ohio Const. Article 1, Section 10, which in pertinent part provides that certain accused criminal offenders "have compulsory process to procure the attendance of witnesses in his behalf." Appellant alleges that Ms. Arthur informed the prosecutor that the attack was captured on cell phone video/pictures. Appellant alleges that the assistant prosecutor's testimony - that no such media of the attack exists - "was of critical importance to [Appellant's] case" to challenge Ms. Arthur's credibility regarding her testimony that such video/pictures did exist.

{¶29} Appellant also argues that calling the prosecutor as a witness in this case is not prohibited by Prof.Cond.R. 3.7, which addresses the ethical considerations when a lawyer is called as a witness.

{¶30} The State argues that the purpose of the subpoena was to delay the trial because the existence of any video/pictures of the attack was discussed in March-May 2018, but the subpoena was not filed until a few days before trial in November 2018.

{¶31} The State also asserts that defense counsel was permitted to question Ms. Arthur on cross examination regarding the alleged video/pictures Appellant took of the attack. The State asserts that Ms. Arthur "did not deny that she told the assistant prosecutor that she thought

Appellant was taking pictures or video of the attack." Therefore, the State argues there was no need to challenge her testimony. Accordingly, the State argues that because "[Ms. Arthur] testified consistent with defense counsel's desire," the assistant prosecutor's testimony was not necessary to Appellant's case.

Rules of Professional Conduct

{¶32} Ohio courts "have no authority to address claimed violations of the Rules of Professional Conduct - that authority rests solely with the Ohio Supreme Court." *State v. Montgomery*, 8th Dist. Cuyahoga No. 99452, 2013-Ohio-4193, ¶ 36, citing *State ex rel. Buck v. Maloney,* 102 Ohio St.3d 250, 2004-Ohio-2590, 809 N.E.2d 20. "[T]he Rules of Professional Conduct have no bearing on the admissibility of evidence." *Id.* " 'A violation of attorney disciplinary rules is not of constitutional magnitude and consequently suppression is not constitutionally required.' " *Id.*, quoting *United States v. Guerrerio,* 675 F.Supp. 1430, 1433 (S.D.N.Y.1987). Therefore, whether a trial attorney complies or violates the Rules of Professional Conduct is immaterial to the question of whether evidence is properly admitted or excluded.

{¶33} Accordingly, we find that compliance with Prof.Cond.R. 3.7 has no bearing on the admissibility of the prosecutor's testimony.

Witness Testimony

{¶34} "The Sixth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution provide an accused with a right of compulsory process to obtain a witness's testimony." *State v. Lavery*, 9th Dist. Summit No. 20591, 2001-Ohio-1638, citing *Pennsylvania v. Ritchie*, 480 U.S. 39, 56, 94 L.Ed.2d 40, (1987), *Columbus v. Cooper*, 49 Ohio St.3d 42, 550 N.E.2d 937 (1990). And "[f]ew rights are more fundamental than the right of an accused to present witnesses on his behalf." *State v. Brown*, 64 Ohio St.3d 649, 652, 1992-Ohio-19, 597 N.E.2d 510 (1992), citing *Taylor v. Illinois*, 484 U.S. 400, 408, 108 S.Ct. 646, 652, 98 L.Ed.2d 798 (1988).

{¶35} "The right to compulsory process, however, is not unlimited." *State v. Denis*, 117 Ohio App.3d 442, 446, 690 N.E.2d 955 (1997), *State v. Collins*, No. 48159, 1984 WL 6341, at *3 (Ohio Ct. App. Dec. 6, 1984), *State v. Smiddy*, 2nd Dist. Stark No. 06CA0028, 2007-Ohio-1342, ¶ 25. "The principle that undergirds the defendant's right to present exculpatory evidence is also the source of essential limitations on the right." *Taylor v. Illinois*, 484 U.S. 400, 410, 108 S.Ct. 646, 654, 98 L.Ed.2d 798 (1988). "The trial process would be in shambles if either party had an absolute right to control the time and content of his witnesses' testimony." *Id.* at 411.

"The State's interest in the orderly conduct of a criminal trial is sufficient to justify the imposition and enforcement of firm, though not always inflexible, rules relating to the identification and presentation of evidence.  *Id.* Therefore, "a defendant's right to present his own witnesses to establish a defense is prescribed by the rules of evidence."  *State v. Denis,* 117 Ohio App.3d at 442, 446, 690 N.E.2d 955 (6th Dist.).  "A trial court has broad discretion in the admission or exclusion of evidence and so long as such discretion is exercised in line with the rules of procedure and evidence, its judgment will not be reversed absent a clear showing of an abuse of discretion with attendant material prejudice to defendant."  *State v. Blair*, 2016-Ohio-2872, 63 N.E.3d 798, ¶ 67, quoting *State v. Richardson,* 4th Dist. Scioto No. 14CA3671, 2015-Ohio-4708, ¶ 62.

{¶36} "A party may not predicate error on the exclusion of evidence during the examination in chief unless" (1) the party proffers the expected testimony or the proffer is apparent from the context of the questions asked, and (2) the exclusion of such evidence must affect a *substantial right* of the party.  *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 113, citing *State v. Gilmore*, 28 Ohio St.3d 190, 503 N.E.2d 147 (1986), syllabus.  If the excluded testimony does not have an impact on the

jury's verdict, it has not prejudiced the movant's substantial rights. *State v. Blair*, 2nd Dist. Montgomery No. 26256, 2015-Ohio-3604, ¶ 14-15.

{¶37} Finally, the Supreme Court of Ohio has "recognize[d] that a prosecuting attorney should avoid being a witness in a criminal prosecution," unless "it is a complex proceeding where substitution of counsel is impractical, * * * the attorney so testifying is not engaged in the active trial of the cause and *it is the only testimony available * * *.*" (Emphasis added.) *State v. Coleman*, 45 Ohio St.3d 298, 302, 544 N.E.2d 622 (1989).[1]

{¶38} During cross examination, Appellant's counsel asked Ms. Arthur: "Okay. And do you, you indicated you recall alleging that [Appellant] held you down, beat you and videoed the incident while it was going on?" Ms. Arthur responded: "*He said he was. I wasn't on the other side of the phone*. All I know is he had it in front of me while he was hitting me." (Emphasis added.)

{¶39} Contrary to Appellant's assertion, Ms. Arthur did not testify that a video of the attack *existed*. Rather, she alleged that Appellant *told her* that he was videoing the attack. In fact, her statement - "I wasn't on the other side of the phone" - indicates that Ms. Arthur was uncertain whether

---

[1] While *Coleman* addressed a prosecutor testifying for the State, we believe the disfavor of having a prosecutor testify in a case is equally, if not more, compelling when it is the defendant who is calling for the prosecutor to testify.

Appellant recorded the attack. Therefore, we find that the assistant prosecutor's proffered testimony - that no video of the attack existed - would not have impeached Ms. Arthur's testimony, or even undermined its credibility, which was the basis of Appellant's argument on appeal. Consequently, we find the assistant prosecutor's excluded testimony would not have impacted the jury's verdict, i.e. it did not affect Appellant's substantial rights. *See Blair*, 2nd Dist. Montgomery No. 26256, 2015-Ohio-3604, ¶ 14-15. Moreover, because Ms. Arthur provided the only testimony necessary to answer Appellant's question regarding the recording of the attack, *Coleman* also supported our conclusion that the assistant prosecutor should not have been called as a witness in this case.

{¶40} Accordingly, the trial court did not abuse its discretion in precluding Appellant from calling the assistant prosecutor as a witness is his case. We overrule Appellant's first assignment of error.

ASSIGNMENT OF ERROR II

{¶41} In his second assignment of error, Appellant alleges that he was denied his right to due process when his trial attorney provided ineffective assistance of counsel by failing to move the trial court for him to appear before the jury in clothing other than a jail uniform.

{¶42} Prior to voir dire and out of jury's presence, the prosecutor brought to the attention of the court and Appellant that the State had:

concerns that the defendant is not in street clothes as he is in a jumper. Um I don't think any of us here want to go forward and go through a trial of this length and magnitude to have the Court of Appeals say, well, but he was – he was in his jumper instead of street clothes. I don't know how the court wants to address that, but I do want to note it on the record that I have some concerns about – about going forward with that.

In response, Appellant's counsel stated: "I have nothing to add to that judge. I am not familiar with the case law to which [the prosecutor] is referring." The judge the stated: "All right. Very well then. Anything further?" Both attorneys responded in the negative, and proceedings continued.

{¶43} Appellant argues that his trial counsel was ineffective for failing to request the trial court for an opportunity to appear before the jury in clothing other than his jail uniform. Appellant argues the United States Supreme Court held that appearing in a jail uniform before a jury is "inherently prejudicial" in *Estelle v. Williams*, 425 U.S. 501, 96 S.Ct. 1961 (1976). Because Appellant's counsel purportedly was not familiar with

*Estelle* or similar case law, and did not request that Appellant be dressed in clothing other than his jail uniform, Appellant argues that his performance was below an objective level of reasonable representation. He also argues that he was "directly prejudiced" by wearing his jail uniform before the jury.

{¶44} The State argues that while *Estelle* held that wearing prison attire can be prejudicial, it did not establish a bright line test to make that determination when wearing prison attire was reversible error. This, the State argues, is because some defendants may prefer to wear prison clothing to elicit sympathy. Therefore, a defendant must show that he or she was compelled to wear prison clothing as a perquisite to finding prejudice. The State argues that Appellant failed to make the showing that his counsel was ineffective.

{¶45} The State also highlights the fact that Appellant's counsel was made aware that Appellant was wearing prison clothing, and because he did not object, Appellant waived any right to claim that it was error. The State further argues that Appellant's assignment of error should be rejected under the invited error doctrine.

{¶46} "To establish constitutionally ineffective assistance of counsel, a defendant must show (1) that his counsel's performance was deficient and (2) that the deficient performance prejudiced the defense and deprived him

of a fair trial." *State v. Barnhart*, 4th Dist. Meigs Nos. 18CA8 and 18CA15, 2019-Ohio-1184, ¶ 64, citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052 (1984). "Failure to satisfy either part of the test is fatal to the claim." *State v. Gillian*, 4th Dist. Gallia No. 16CA11, 2018-Ohio-4983, ¶ 12, citing *Strickland* at 697.

{¶47} The United States Supreme Court has addressed the issue of "whether an accused who is compelled to wear identifiable prison clothing at his trial by a jury is denied due process or equal protection of the laws." *Estelle v. Williams*, 425 U.S. 501, 502, 96 S.Ct. 1691, 1692, 48 L.Ed.2d 126 (1976).

{¶48} *Estelle* found that in large part courts have "determined that an accused should not be compelled to go to trial in prison or jail clothing because of the possible impairment of the presumption [of innocence] so basic to the adversarial system." (Citations omitted.) *Id.* at 504. However, *Estelle* also recognized that courts have declined to adopt a per se rule invalidating all convictions where a defendant had appeared before the jury in prison clothing. *Id.* at 508. The court stated that:

> [t]he reason for this judicial focus upon compulsion is
> simple; instances frequently arise where a defendant prefers
> to stand trial before his peers in prison garments. The cases

show, for example, that it is not an uncommon defense tactic

to produce the defendant in jail clothes in the hope of

eliciting sympathy from the jury.  *Id*. at 507-508, citing

*Andern v. Watt,* 475 F.2d 881, 882 (10th Cir. 1973); *Watt v.*

*Page*, 452 F.2d 1174, 1176 (10 Cir. 1972), Cf. *Garcia v.*

*Beto*, 452 F.2d 655, 656 (5th Cir. 1971).

Therefore, the court held that:

although the State cannot, consistently within the Fourteenth

Amendment, compel an accused to stand trial before a jury

while dressed in identifiable prison clothes, the *failure to*

*make an objection* to the court as to being tried in such

clothes, for whatever reason, *is sufficient to negate the*

*presence of compulsion necessary to establish a*

*constitutional violation*.  (Emphasis added.)  *Estelle,* 425

U.S. 501, 512-13, 96 S.Ct. 1691, 1697, 48 L.Ed.2d 126

(1976)

{¶49} In *State v. Judy*, 4th Dist. Ross No. 08CA3013, 2008-Ohio-

5551, ¶ 37, the Court addressed whether Appellant's trial counsel's failure to

object to the fact that his client wore prison clothing at trial constituted

ineffective assistance of counsel.  The appellant in *Judy* appeared at trial

dressed in his prison clothes. *Id*. at ¶ 4. But during voir dire, Appellant's counsel asked the jury if anyone would treat Appellant unfairly because his of his prison clothes. *Id*. "[T]here was no indication from the jury that there would be a problem." *Id*.

{¶50} On direct appeal, Appellant alleged that his "counsel was ineffective for not dressing her appropriately for trial." *Id*. at ¶ 32. After reviewing the holding in *Estelle*, the court in *Judy* concluded that "[a]lthough other attorneys may have suggested or done otherwise, we decline to second-guess trial counsel's decision to allow his client to stand trial in prison garb because this decision has been acknowledged to be a strategic one." *Id*. at ¶ 42, citing *Estelle, supra, United States v. Wells*, 9th Cir. No. 97-35656, 1998 WL 741173 (Oct. 13, 1998), *State v. Singer,* 4th Dist. Ross No. 99CA2845, 2000 WL 1093577, (July 31, 2000), *State v. Edgington*, 4th Dist. Ross No. 95CA2151, 1996 WL 720860 (Dec. 11, 1996). Accordingly, the court rejected Appellant's ineffective assistance of counsel argument.

{¶51} In addition, overwhelming evidence supporting an appellant's convictions may negate any prejudice for wearing prison clothing at trial. *See State v. Godbolt*, 5th Dist. Licking No. 2003CA00034, 2004-Ohio-317, ¶ 21.

{¶52} In this case, unlike in *Judy*, Appellant's counsel was apparently unaware that under the law a defendant could not be compelled to wear prison clothes to trial. However, the prosecutor put Appellant on notice that a defendant had the option to wear street clothes at trial rather than prison clothing, even noting that he did not want Appellant's prison clothing to become an issue on appeal. Nevertheless, Appellant never objected to his prison attire or otherwise expressed a desire to wear street clothes at trial. As *Estelle* stated: "the failure to make an objection to the court as to being tried in [prison] clothes, for whatever reason, is sufficient to negate the presence of compulsion necessary to establish a constitutional violation."

{¶53} Finally, there is overwhelming evidence supporting Appellant's convictions. Although there are some inconsistencies in the testimony of some of the witnesses, the evidence and testimony support that Appellant physically assaulted Ms. Arthur and caused her significant injury. Accordingly, we find that Appellant cannot show that he was prejudiced by wearing his prison clothing at trial. *See Godbolt.*

{¶54} Absent deficient representation and a lack of prejudice, we find that Appellant's counsel was not ineffective. Accordingly, we overrule Appellant's second assignment of error.

CONCLUSION

**{¶55}** Having overruled both of Appellant's assignments of error, we affirm the trial court's judgment of conviction.

**JUDGMENT AFFIRMED.**

# JUDGMENT ENTRY

It is ordered that the JUDGMENT BE AFFIRMED and costs be assessed to Appellant.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Vinton County Common Pleas Court to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted. The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of sixty days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. & Abele, J.: Concur in Judgment and Opinion.

For the Court,


BY: _____
Matthew W. McFarland, Judge

## NOTICE TO COUNSEL
**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**